ORDERED.

**Dated:  September 30, 2024**

_____

Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 6:23-bk-00120-LVV |
| George Luis Jacoub | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Gabriella Murillo | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 6:23-ap-00008-LVV |
| v. | ) | |
| | ) | |
| George Luis Jacoub | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
MEMORANDUM OPINION ON DISCHARGE OF DEBT**

Gabriella Murillo's ("Murillo" or "Plaintiff") life was forever changed when George Luis

Jacoub's ("Jacoub" or "Defendant") rental car crashed into the vehicle she occupied as it was

stopped on the side of the highway. The accident rendered her quadriplegic, but Jacoub walked

away from the scene unscathed. Jacoub was never tested to see if he was intoxicated. In fact,

Jacoub never suffered any punishment for the accident. Now in bankruptcy, Jacoub seeks to discharge any debt to Murillo resulting from the accident.

Bankruptcy allows the honest and unfortunate debtor a fresh start by relieving them from prepetition debt. But this discharge is limited. Congress has excluded certain types of debt from a bankruptcy discharge for policy reasons. Personal injury resulting from a debtor's unlawful operation of a vehicle while intoxicated is one of these debts. Because Jacoub was never tested for intoxication, this Court must rely on witness testimony and other circumstantial evidence to decide whether, by a preponderance of the evidence, he was intoxicated by the use of drugs or alcohol as prohibited under Florida law. Due to the overwhelming witness testimony and technical evidence presented at trial, the Court concludes Jacoub was unlawfully operating the vehicle while intoxicated by drugs or alcohol and any debt to Murillo for her personal injuries resulting from the accident will not be discharged.

## FINDINGS OF FACT

During the early morning hours of June 16, 2019, Murillo was in the passenger seat of a black Toyota (the "Toyota") that was parked on the emergency lane of State Road 408 in Orlando.[1] At approximately 2:30 a.m., an incoming white Nissan (the "Nissan"), a car rented by Jacoub from Enterprise, crashed into the rear end of the Toyota at a speed of 92 miles per hour.[2] After being rear ended by the Nissan, the Toyota subsequently collided with a wall to the right of it and then bounced off the wall, leaving it in the position found at the accident scene.[3] As a result of this accident, Murillo was rendered a quadriplegic.[4] A witness to the accident, John

---

[1] Doc. No. 88. 1/31/24 Trial Tr. 66:10-20; 68:5-17.
[2] Doc. No. 88. 1/31/24 Trial Tr. 69:9-25; 89:21-90:8; 165:14-15. *See also* Ex. 2.
[3] Doc. No. 88. 1/31/24 Trial Tr. 64:16-66:9.
[4] It has been stipulated by the parties for purposes of this adversary proceeding that Murillo's injuries were caused by the collision.

Henry ("Henry"), saw Jacoub in the Nissan after the crash.[5] While Henry was attempting to help Murillo, he noticed that Jacoub had left the accident scene.[6] Henry described the accident as the worst he has ever seen.[7]

*Jacoub's Interactions with Sheriff's Deputies*

Soon after the accident, Corporal John Alden ("Officer Alden") with the Orange County Sheriff and his deputy (the "Deputy Officer") (together the "Officers") were dispatched to a call for service to the scene of the accident.[8] The Officers entered State Road 408 from the ramp on Yucatan Avenue.[9] Upon entering State Road 408 at 2:39 a.m., Officer Alden saw a man wearing black clothing walking eastbound away from the accident scene.[10] Thinking this man may have been involved in the accident, the Officers pulled over and approached the man, who Officer Alden later identified as Jacoub.[11] Jacoub's interactions with the Officers and other personnel were recorded on Officer Alden's body camera. The Deputy Officer began patting down Jacoub as part of a measure used to ensure officer safety.[12] While patting him down, the Deputy Officer asked him if he had been drinking.[13] Jacoub disclosed that he had consumed three or four drinks.[14] After some additional questions by the Deputy Officer, Jacoub also disclosed that he was coming from downtown and that he was driving by himself.[15] After patting him down, the Deputy Officer directed Jacoub to stand by the wall.[16]

---

[5] Doc. No. 88. 1/31/24 Trial Tr. 161:17-163:16.
[6] Doc. No. 88. 1/31/24 Trial Tr. 161:17-163:16.
[7] Doc. No. 88. 1/31/24 Trial Tr. 156:24-25.
[8] Doc. No. 88. 1/31/24 Trial Tr. 96:6-97:5.
[9] Doc. No. 88. 1/31/24 Trial Tr. 96:6-97:5.
[10] Doc. No. 88. 1/31/24 Trial Tr. 96:6-97:5. *See also* Ex. 9.
[11] Doc. No. 88. 1/31/24 Trial Tr. 96:6-97:5; 100:12-21. There was a third officer on the scene who was in and out throughout the incident. Jacoub's conversations, however, were mostly with Officer Alden and the Deputy Officer.
[12] Doc. No. 88. 1/31/24 Trial Tr. 103:15-18; 109:8-24. *See also* Ex. 9.
[13] Doc. No. 88. 1/31/24 Trial Tr. 109:8-24. *See also* Ex. 9.
[14] Doc. No. 88. 1/31/24 Trial Tr. 109:8-24. *See also* Ex. 9.
[15] Doc. No. 88. 1/31/24 Trial Tr. 109:8-24. *See also* Ex. 9.
[16] Doc. No. 88. 1/31/24 Trial Tr. 126:17-22. *See also* Ex. 9.

For approximately the next twenty minutes, the Officers largely did not ask Jacoub any questions.[17] The questions that were asked by the Officers mainly related to Jacoub's health. At some points, Jacoub initiated conversation with the Officers on his own. Without being asked a question, he told the Officers, "It's kind of hard when you're driving, and you just plow into somebody."[18] On multiple occasions, Officer Alden advised Jacoub that they were not investigating him since that was the purview of the Florida Highway Patrol.[19] Jacoub appeared to be in pain during this time, touching his abdominal area multiple times.[20] Noticing that Jacoub was in pain, Officer Alden called the fire squad.[21] Based on his observations that night, Officer Alden testified that he believed Jacoub's normal faculties were impaired by alcohol or drugs.[22]

*Jacoub's Interactions with Medical Personnel at the Scene*

At approximately, 2:59 a.m., the Battalion Chief for the Orange County Fire Department Billy Franklin Richardson, Jr. ("Chief Richardson") approached Jacoub to render aid.[23] Chief Richardson asked Jacoub if he was in one of the vehicles, to which Jacoub responded that he was the driver.[24] As the Battalion Chief, Chief Richardson did not carry any medical equipment and as such after 30 seconds of interaction with Jacoub, he went back to bring paramedics to the scene.[25] Three paramedics subsequently arrived and started evaluating Jacoub's health. At one point, the following exchange occurred between an unidentified paramedic and Jacoub:

> Paramedic: "How long ago did you do the coke?"
>             "No idea?"
> Jacoub:     "Two hours ago."
> Paramedic: "Take anything else with it?"

---

[17] *See* Ex. 9.
[18] Doc. No. 88. 1/31/24 Trial Tr. 111:8-11. *See also* Ex. 9.
[19] Doc. No. 88. 1/31/24 Trial Tr. 103:2:25; 110:4-12; 118:9-12. *See also* Ex. 9.
[20] *See* Ex. 9.
[21] Doc. No. 88. 1/31/24 Trial Tr. 123:14-18; 129:2-7. *See also* Ex. 9.
[22] Doc. No. 88. 1/31/24 Trial Tr. 111:2-7; 130:9-132:8.
[23] Doc. No. 88. 1/31/24 Trial Tr. 83:5-87:3. *See also* Ex. 9.
[24] Doc. No. 88. 1/31/24 Trial Tr. 83:5-87:3. *See also* Ex. 9.
[25] Doc. No. 88. 1/31/24 Trial Tr. 83:5-87:3. *See also* Ex. 9.

Jacoub:        "Alcohol."[26]

The three paramedics attending to Jacoub handed him off to Glenn Kiture ("Paramedic Kiture"), who was the lead paramedic.[27] Paramedic Kiture testified that he had an independent memory of this incident since it was his best friend's birthday the following day.[28] At 3:12 a.m., Jacoub was lifted into an ambulance by the paramedics.[29]

*Jacoub is Transported to the Hospital*

While in the ambulance, Paramedic Kiture asked Jacoub some simple questions and noticed that his responses were a little slow, which led him to believe Jacoub was altered by alcohol.[30] While asking these questions, Jacoub admitted to drinking alcohol, specifically having some beers and some shots.[31] When asked if he takes any drugs, Jacoub said he takes human growth hormone, which Paramedic Kiture found to be a  strange admission.[32] Paramedic Kiture also noticed that Jacoub's clothes had a strong smell of alcohol.[33] While taking his temperature, Paramedic Kiture also was able to smell alcohol on Jacoub's breath.[34] Before the end of his shift, Paramedic Kiture prepared a report of this incident.[35] The report noted "ETOH," which Paramedic Kiture testified indicates the patient is impaired by and under the influence of alcohol.[36] His report also noted, among other things, that Jacoub was alert, had a Glasgow Coma Scale test of 15, had a steady gait, and that he had PERRLA eyes.[37] Based on his observations,

---

[26] *See* Ex. 9.
[27] Doc. No. 88. 1/31/24 Trial Tr. 134:15-17. *See also* Ex. 9.
[28] Doc. No. 88. 1/31/24 Trial Tr. 138:10-15.
[29] *See* Ex. 9.
[30] Doc. No. 88. 1/31/24 Trial Tr. 141:1-5.
[31] Doc. No. 88. 1/31/24 Trial Tr. 141:1-21.
[32] Doc. No. 88. 1/31/24 Trial Tr. 142:20-143:8.
[33] Doc. No. 88. 1/31/24 Trial Tr. 141:1-19.
[34] Doc. No. 88. 1/31/24 Trial Tr. 141:1-142:4.
[35] Doc. No. 88. 1/31/24 Trial Tr. 135:13-136:21. *See also* Ex. 3.
[36] Doc. No. 88. 1/31/24 Trial Tr. 137:15-21; 143:22-144:16. *See also* Ex. 3.
[37] The Glasgow Coma Scale test is used to determine whether a patient is awake or comatose. The highest score possible is a 15. PERRLA eyes are an indication that the examinee's eyes are reflective and that there was no narcotic use by the examinee. Doc. No. 88. 1/31/24 Trial Tr. 41:18-21; 148:1-18; 146:20-148:20.

Paramedic Kiture testified that he believed it was more likely than not that Jacoub was impaired when he encountered him.[38] Jacoub arrived at the Orlando Health hospital at approximately 3:37 a.m.[39]

*Jacoub is Evaluated by Medical Personnel at the Hospital*

Dr. Jillian Davidson ("Dr. Davidson") was the emergency room physician at Orlando Health when Jacoub arrived.[40] As an emergency room physician, Dr. Davidson was in charge of overseeing the medical residents as they examine and treat patients.[41] Although Dr. Davidson could not independently recall the details of that night, she was able to refresh her recollection by looking at the medical records.[42] At the hospital, a medical resident examined Jacoub and completed a flow chart.[43] On the flow chart, the resident wrote, "Grossly intoxicated."[44] Dr. Davidson testified that,

> We typically write grossly intoxicated when someone is obviously intoxicated where we can tell just by looking at them that they are not in their normal state of mind. Sometimes that can mean they smell like alcohol, or they are slurring their speech, or we saw them try to get up and walk and they were stumbling. And a lot of times we write that as a generalization and it doesn't typically tell us specifically what they may be intoxicated with but is a very common thing for us to write when we're worried someone is not in their normal state of mind.[45]

The flow chart also indicated that Jacoub had a past medical history of using THC and cocaine.[46] Dr. Davidson testified that such entries are typically self-reported by the patient and does not

---

[38] Doc. No. 88. 1/31/24 Trial Tr. 144:18-23.
[39] Ex. 4.
[40] Doc. No. 88. 1/31/24 Trial Tr. 25:2-26:21.
[41] Doc. No. 88. 1/31/24 Trial Tr. 25:2-26:21.
[42] Doc. No. 88. 1/31/24 Trial Tr. 27:6-14.
[43] A flow chart includes a description of what happened and documents a patient's physical exam, their results, what happened to the patient at the hospital, and their final diagnosis. Doc. No. 88. 1/31/24 Trial Tr. 27:18-25. *See also* Ex. 4 at 24-25.
[44] Ex. 4 at 25.
[45] Doc. No. 88. 1/31/24 Trial Tr. 29:2-11.
[46] Ex. 4 at 24.

necessarily mean that the patient consumed those drugs that night.[47] The other notations in the flow chart indicated, among other things, that Jacoub was alert, well-nourished, well-developed, had a Glasgow Coma Scale score of 15, and that he was oriented times three.[48]

Dr. Davidson testified that the only indication in the flow chart of him being grossly intoxicated was the note but that the remaining sections were not inconsistent with Jacoub being grossly intoxicated.[49] She also noted that there is a tendency to circle a lot of normal things but include a more detailed description, which more accurately describes a patient's condition.[50] Dr. Davidson had to approve all entries on the flow chart.[51] Dr. Davidson also testified that based upon her review of the record and her knowledge of the ordinary business and recordkeeping at Orlando Health, it was her opinion within a reasonable degree of medical probability that Jacoub's normal faculties were impaired that evening.[52]

At approximately 7:30 a.m., Jacoub was seen by a daytime trauma team.[53] The trauma team made their recommendation that Jacoub should stay for observation.[54] Despite that recommendation, Jacoub was adamant about leaving and left the hospital against medical advice at 8:23 a.m.[55] Dr. Davidson testified that Jacoub was taking a life-threatening risk by leaving against medical advice.[56]

Notably, Jacoub's blood alcohol content was never tested. Dr. Davidson testified that they test a patient's blood for purposes of treatment and blood alcohol content is not typically

---

[47] Doc. No. 88. 1/31/24 Trial Tr. 30:1-19.
[48] A patient is oriented times three if they can answer correctly questions about their name, the current year, and their physical location. Doc. No. 88. 1/31/24 Trial Tr. 40:9-42:10. *See also* Ex. 4.
[49] Doc. No. 88. 1/31/24 Trial Tr. 42:6-10; 50:15-18.
[50] Doc. No. 88. 1/31/24 Trial Tr. 41:1-15.
[51] Doc. No. 88. 1/31/24 Trial Tr. 28:1-5.
[52] Doc. No. 88. 1/31/24 Trial Tr. 35:1-6.
[53] Doc. No. 88. 1/31/24 Trial Tr. 32:11-19; 44:24-25.
[54] Doc. No. 88. 1/31/24 Trial Tr. 32:11-19. *See also* Ex. 4 at 15.
[55] Doc. No. 88. 1/31/24 Trial Tr. 32:11-21. *See also* Ex. 4 at 15 and 50
[56] Doc. No. 88. 1/31/24 Trial Tr. 32:22-23.

required for treatment.[57] In this case, she testified that because Jacoub was grossly intoxicated, there was also no need to perform such a test.[58] Dr. Davidson also confirmed that she was not requested to test Jacoub's blood alcohol content by law enforcement who were not present at the hospital during her shift.[59]

*Jacoub Files for Bankruptcy*

On September 17, 2019, Murillo initiated an action in state court seeking to recover from Jacoub under theories of automobile negligence.[60] A trial in the state court proceedings was scheduled for January 17, 2023. Jacoub filed a petition for relief under chapter 7 of the Bankruptcy Code on January 12, 2023, staying the state court action. As such, to this date, there has been no judgment finding Jacoub liable to Murillo. Nevertheless, Plaintiff seeks a determination that any debt to her for her injuries resulting from this accident is non-dischargeable.

Murillo filed a complaint on February 15, 2023, seeking to except from discharge her claim against Jacoub under 11 U.S.C. §§ 523(a)(6) (willful and malicious injury) and (a)(9) (driving while unlawfully intoxicated by alcohol or drugs).[61] This Court held a two-day trial starting on January 31, 2024 with the sole issue being to determine non-dischargeability.[62] At the trial, the only evidence presented were witness accounts of what transpired after the accident and each side's experts. Jacoub did not testify at the trial. In discovery from the state court proceeding, Jacoub invoked his Fifth Amendment right against self-incrimination to a whole host

---

[57] Doc. No. 89. 2/1/24 Trial Tr. 13:23-14:14.
[58] Doc. No. 89. 2/1/24 Trial Tr. 15:19-16:7.
[59] Doc. No. 89. 2/1/24 Trial Tr. 16:17-17:1.
[60] *Gabriella Murillo v. George Luis* Jacoub, Case No. 2019-CA-011330-O pending before the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida.
[61] Unless specified otherwise, all references to statutory sections refer to Title 11 of the United States Code.
[62] In her Complaint, Plaintiff also sought the bankruptcy court to liquidate damages. However, such requests were stricken by the Court with the proceeding being limited to determining non-dischargeability only. *See* 28 U.S.C. § 157(b)(5).

of questions asked in interrogatories and during his deposition.[63] The crux of the questions to which Jacoub invoked the Fifth Amendment focused on whether Jacoub had consumed alcohol or drugs, the timing of such consumption, and how the accident occurred.[64]

### Accident Report Privilege

Defendant argues that the accident report privilege precludes the Court from considering as evidence statements made by Jacoub to the officers at the scene of the accident. The accident report privilege is derived from Fla. Stat. § 316.066(4), which provides:

> Except as specified in this subsection, each crash report made by a person involved in a crash and any statement made by such person to a law enforcement officer for the purpose of completing a crash report required by this section shall be without prejudice to the individual so reporting. Such report or statement may not be used as evidence in any trial, civil or criminal. However, subject to the applicable rules of evidence, a law enforcement officer at a criminal trial may testify as to any statement made to the officer by the person involved in the crash if that person's privilege against self-incrimination is not violated.

Defendant argues that the accident report privilege applies to his statements made to officers because he believed that he was required to answer their questions. Although Defendant concedes that the officers on the scene were not charged with investigating the accident, he argues the court must consider the situation from the perspective of the defendant, not the officers. Plaintiff counters that the officers were only on a call for service and had no role in investigating or preparing an accident report. According to Plaintiff, therefore, based on the plain text of the statute, the privilege does not apply.

The purpose of the accident report privilege is to protect against Fifth Amendment violations. *State v. Norstrom*, 613 So. 2d 437, 440 (Fla. 1993). Florida law requires officers to complete a crash report upon an accident and imposes a duty on an individual involved in a crash

---

[63] Doc. No. 88. 1/31/24 Trial Tr. 23:5-18; 87:6-92:1. *See also* Ex. 24
[64] Doc. No. 88. 1/31/24 Trial Tr. 23:5-18; 87:6-92:1. *See also* Ex. 24

to report information about the accident.[65] The privilege therefore simultaneously safeguards Fifth Amendment rights while allowing one to comply with their statutory duties. *Norstrom*, 613 So. 2d at 440. The accident report privilege does not apply to statements made during a criminal investigation. *See State v. Blocker*, 360 So. 3d 742, 746-747 (Fla. 4th DCA 2023). However, when a criminal investigation follows an accident investigation, for the privilege to no longer apply, the officer must adequately inform the defendant that the accident investigation phase has ended. *See id.*

Here, the accident report privilege does not bar statements made by Jacoub to the officers because the officers were not conducting any sort of investigation, let alone an investigation of the accident. Officer Alden testified that he was on scene for a call for service and that his role was limited to ensuring public safety. The Court finds Officer Alden's testimony credible. Officer Alden, on multiple occasions, informed Jacoub that they were not conducting an investigation of the accident as that was the purview of another department, the Florida Highway Patrol.[66] The officers, for the most part, did not initiate conversation with Jacoub. The questions that they did ask were generally related to Jacoub's health or standard questions common in roadside stops with officers. As the officers were not conducting any sort of investigation, the Court finds the accident report privilege inapplicable.

Defendant cites to *Vedner v. State*, 849 So. 2d 1207 (Fla. 5th DCA 2003) and *Nash Miami Motors, Inc. v. Ellsworth*, 129 So. 2d 704 (Fla. 3d DCA 1961) to argue the accident report privilege applies. However, neither of these cases support Defendant's position. Defendant relies on the following statement in *Vedner*:

---

[65] Fla. Stat. § 316.066(1).

[66] For example, Officer Alden's statements to Jacoub included the following: "Like I said we're just making sure you're okay and we got to make sure you talk to FHP," "You wait for FHP. It's what you should have done back there," and "FHP works traffic accidents so we got to wait for Florida Traffic Patrol to come here and deal with this."

> [I]f during the course of a vehicular accident investigation a law enforcement officer seeks to elicit statement of a person who has been given "any indication" that he or she is required to give accident information, the officer must advise the person of his or her *Miranda* rights. Under those circumstances only statements made after the advisement of rights may subsequently be used in civil or criminal trials, or administrative proceedings.

849 So. 2d at 1212. *Vedner* requires the statement be made during the course of a vehicular accident investigation, which was not the case here. In any event, the officers never gave any indication to Jacoub that he had to respond to their questions or that they were investigating the accident. Indeed, Officer Alden made clear to Jacoub on multiple occasions that they were not in charge of investigating the accident. Accordingly, *Vedner* does not necessitate a contrary result.

In *Ellsworth*, one officer completed an accident investigation on the scene of an accident while a second officer, who was a special accident investigator, brought the defendant to the station to take his statement. The second officer purported that his investigation was "for discovery of possible criminal charges which might arise from the accident." 129 So. 2d at 706. The court found that the accident report privilege applied because the second officer did not adequately inform the defendant that the accident investigation phase was over. *See id.*; *see also State v. Coffey*, 212 So. 2d 632, 635-636 (Fla. 1968) (discussing *Ellsworth*). Here, unlike in *Ellsworth*, there never was an accident investigation phase. As such, the distinctions about the criminal and accident phase of the investigation do not apply.

Additionally, the accident report privilege does not apply to hit-and-run drivers. *Williams v. State*, 208 So. 3d 196 (Fla. 3d DCA 2016); *Cummings v. State*, 780 So. 2d 149 (Fla. 2d DCA 2000) (noting the accident privilege does not apply when a person chooses to leave the scene of an accident in violation of Florida law). Defendant argues that he was not a hit-and-run driver. To support his argument, he cites to a statement made by Officer Alden where he advised Jacoub that it would behoove him to not go any further since if he did, he would be considered fleeing

the scene.[67] The accident occurred at approximately 2:30 a.m. The Officers came into contact

with Jacoub a few minutes later at 2:39 a.m. as he was walking away from the scene. Just

because Jacoub was walking, and not running, does not make a difference. The evidence shows

that Jacoub left the scene only minutes after the accident and had it not been for the Officers, he

would have continued to flee. Under such circumstances, the Court finds Jacoub to be a hit-and-

run driver. It is no defense that he did not continue to leave the accident scene after he was

stopped by the Officers. Accordingly, for this additional reason, the accident report privilege

does not apply.

## Legal Analysis

### Section 523(a)(9)

Section 523(a)(9) excepts from discharge any debt "for death or personal injury by the

debtor's operation of a motor vehicle, vessel, or aircraft if such operation was unlawful because

the debtor was intoxicated from using alcohol, a drug, or another substance." In Florida, the

operation of a vehicle is unlawful when the driver is under the influence of alcohol or certain

chemical or controlled substances to the extent that his normal faculties are impaired or when the

driver has a blood or breath alcohol level that is over a certain level. Fla. Stat. § 316.193(1). The

burden of proof is on the creditor to show that by a preponderance of the evidence her debt is

excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In this case, there is no scientific evidence in the form or a blood test or breath analysis

which would indicate Jacoub's blood alcohol level at the time of the accident. Instead, the Court

must consider witness testimony of Jacoub's behavior and appearance shortly after the accident

to determine whether his normal faculties were impaired by the use of alcohol or drugs.

*Witnesses Testify that Jacoub Was Intoxicated*

---

[67] Doc. No. 88. 1/31/24 Trial Tr. 110:4-12; 127:6-20.

After considering all of the testimony and other evidence, the Court concludes that Defendant was impaired by alcohol or drugs at the time of the accident. The evidence here is overwhelming. Nearly every person to have contact with Jacoub after the accident reports that he was intoxicated. His behavior, leaving the scene of the accident, leaving the hospital against medical advice, asserting a fifth-amendment privilege, only reinforces this conclusion.

Jacoub admitted to drinking alcohol on various occasions. He told the Deputy Officer that he had three to four drinks. He told Paramedic Kiture that he had some beers and some shots. Jacoub even admitted to doing cocaine with some alcohol two hours prior to the accident in a conversation overheard on Officer Alden's body camera. Defendant argues that these statements can only show that Jacoub drank alcohol that night, not that he was impaired by alcohol while driving.[68] Defendant is correct that drinking alcohol does not automatically result in intoxication and impairment. Here, it is a piece of the puzzle. When coupled with the testimony of witnesses who encountered Jacoub that night, the Court must conclude he was impaired.

Each of the three witnesses that encountered Jacoub that evening testified that he was impaired or grossly intoxicated. Paramedic Kiture, who was examining Jacoub in close proximity inside the ambulance, testified that Jacoub was slow in responding to his questions and his clothes and breath had a strong odor of alcohol. Based on his experience, Paramedic Kiture testified that the manner in which Jacoub responded to his questions is indicative of someone who was altered by alcohol, not something he would usually see when treating a patient who was sober while involved in a car accident.[69] Based on his entire examination of and interactions with Jacoub, Paramedic Kiture noted "ETOH" in his report and concluded that Jacoub was impaired by and under the influence of alcohol.

---

[68] Defendant did not address the statement about the cocaine in his closing arguments; however, the Court presumes that Defendant would advance the same argument about the statement about the cocaine.

[69] Doc. No. 88. 1/31/24 Trial Tr. 147:7-22.

Defendant argues that Paramedic Kiture's testimony is not credible on the grounds that he was prejudiced by his experience as a paramedic and just assumed alcohol was the cause of the accident. But the Court found Paramedic Kiture credible and only bolstered by his years of experience as a paramedic. He also did not reach his conclusion without reason but supported it with observations of Jacoub. Paramedic Kiture's observations were also corroborated by other witnesses.

At the hospital, the examining resident indicated that Jacoub was "grossly intoxicated." According to Dr. Davidson this is typically used at Orlando Health to indicate that the patient was "obviously intoxicated where we can tell just by looking at them that they are not in their normal state of mind." She testified that the note would commonly reflect a patient being "wasted" because "it is apparent to everyone taking care of him at the time that he is not in his normal state of mind."[70] Dr. Davidson testified that it was her opinion within a reasonable degree of medical probability that Jacoub's normal faculties were impaired.

Defendant argues that the Court should discount the note of "grossly intoxicated" and Dr. Davidson's testimony because it is contradicted by all the other notations in the flow chart indicating Jacoub was alert, had a Glasgow Coma Scale score of 15, and that he was oriented times three. However, Dr. Davidson testified that these notations are not inconsistent with gross intoxication.[71] Even Defendant's own expert admitted a person could be impaired by alcohol and still be alert, oriented and have a Glasgow Coma Scale score of 15.

Officer Alden also testified that it was his opinion that Jacoub's normal faculties were impaired by alcohol. He based his opinion on noticing that Jacoub was staggering, that he was sweating profusely, and the admission by Jacoub that he had been drinking. Defendant counters

---

[70] Doc. No. 88. 1/31/24 Trial Tr. 50:19-25.
[71] She also testified that there is a tendency to circle a lot of normal things and include a more specific description that more accurately reflects a patient's condition.

that the body camera footage does not show Jacoub staggering and that the sweating could be due to other reasons – meaning the only basis for Officer Alden's opinion is Jacoub's admission that he had been drinking. As noted previously, admitting to drinking does not automatically equal intoxication or impairment. Defendant also argues that in his deposition testimony, Officer Alden could not state whether Jacoub was impaired by alcohol or drugs and that he changed his testimony for trial.[72]

Based on its own observation of the body camera footage, the Court could not determine that Jacoub was staggering. The footage did show that he was, at times, unsteady on his feet, but he was not staggering. The Court also agrees there could be other reasons for the excessive sweating. While the Court finds Officer Alden's testimony credible – he was at the scene and interacted with Defendant while the Court only has body camera footage – it discounts Officer Alden's testimony in light of all Defendant's points. Still, however, Officer Alden's testimony has value in that his testimony is consistent with the testimony of the other witnesses that evening and thus further corroborates their observations.

Defendant argues that not every witness believed Jacoub was intoxicated. He cites to deposition testimony from Chief Richardson. During his deposition, Chief Richardson testified that he could not determine whether Jacoub was under the influence of alcohol or drugs. However, Chief Richardson also testified that he barely remembered this incident. His interaction with Jacoub lasted for all of approximately 30 seconds. Given the little interaction Chief Richardson had with Jacoub and his acknowledgment of barely remembering this incident, his testimony is not helpful and does not rebut the evidence that Jacoub was intoxicated.

*The Expert Witnesses*

---

[72] At his deposition, Officer Alden testified that it was his opinion that Jacoub was possibly intoxicated but at trial, he testified it was his opinion that Jacoub was intoxicated.

Plaintiff's accident reconstructionist expert witness, Dr. Srinivas Kadiyala ("Dr. Kadiyala"), further corroborated these witness accounts with details from the vehicle's onboard data recorders. Dr. Kadiyala analyzed crash data retrieval from black boxes in the Toyota and Nissan, which is limited to five seconds of data prior to the collision. Dr. Kadiyala testified that in the five seconds prior to the collision, the Nissan, Jacoub's vehicle, traveled straight in the emergency lane until it collided with the Toyota, Murillo's vehicle, at 92 miles per hour.[73] This was a well-lit area and the Toyota's running lights were on.[74] The data further showed that the driver did not try to stop or turn away from the crash as the brakes were not engaged and the only activity in the steering wheel was a slight turn half a second before collision.[75] Coupled with the witness testimony, these details are consistent and further corroborate the testimony that the driver, Jacoub, was impaired at the time of the crash.

Defendant provided no expert testimony to rebut the analysis or conclusions of Dr. Kadiyala. Defendant did, however, offer the testimony of Dr. Timothy Dougherty ("Dr. Dougherty") in an attempt to refute the testimony that Jacoub was impaired by drugs or alcohol.[76] Defendant asserts Dr. Dougherty's testimony shows that there was no evidence of impairment. Dr. Dougherty reviewed the body camera footage and medical records. Based on his review, he testified that he could not determine within a reasonable degree of medical certainty that Jacoub was impaired, pointing to, among other things, a lack of staggering in the video and notations in the medical records that Jacoub was alert, oriented times three and had a Glasgow

---

[73] Doc. No. 88. 1/31/24 Trial Tr. 69:18-25; 72:1-20.
[74] Doc. No. 88. 1/31/24 Trial Tr. 72:1-20. *See also* Ex. 11.
[75] Doc. No. 88. 1/31/24 Trial Tr. 70:23-71:24.
[76] Plaintiff objected to testimony by Dr. Dougherty under *Daubert*, arguing that his testimony was pure opinion with no basis in methodology given that Dr. Dougherty's opinion was based on medical certainty and that he could not point to a single peer-reviewed literature that approved his methodology. The Court permitted Dr. Dougherty to testify and reserved its decision on the objection. The Court now finds Dr. Dougherty to be qualified to testify as an expert under *Daubert* given his experience and educational background in the field and finds his methodology to be sufficiently reliable.

Coma Scale score of 15.[77] But he also testified that he could not determine within a reasonable degree of medical certainty that Jacoub was *not* impaired.[78] Dr. Dougherty conceded that all the markings in Jacoub's medical reports were not inconsistent with someone who was impaired by alcohol.[79] This is consistent with Dr. Jacobson's testimony that a person could have all these indications and still be grossly intoxicated. Accordingly, Dr. Dougherty's testimony does nothing to rebut the evidence presented by Plaintiff.

Defendant also argues that Jacoub's ability to sign out of the hospital against medical advice is a sign that he was not intoxicated. Dr. Dougherty testified that had Jacoub been grossly intoxicated, the hospital would not have allowed him to sign out against medical advice because the patient would lack the capacity to make that decision.[80] However, Jacoub signed out of the hospital at 8:23 a.m. – almost six hours after the accident. It is common knowledge intoxicated people who stop drinking alcohol tend to sober up over time. Additionally, Dr. Davidson testified that alcohol degrades rapidly in the blood and that it is common to see patients who are intoxicated with alcohol in the middle of the night be clinically sober the following morning, meaning they can be safely discharged even if they are still mildly intoxicated.[81] Accordingly, Jacoub having the ability to sign out against medical advice at 8:23 a.m. is not evidence that he was not grossly intoxicated six hours earlier.

*Plaintiff is Entitled to An Adverse Inference*

Additionally, Plaintiff asks the Court for an adverse inference from Defendant's invocation of the Fifth Amendment. Defendant argues that Plaintiff cannot meet her burden with an adverse inference alone and that the rest of the evidence does not support a finding of Jacoub

---

[77] Doc. No. 89. 2/1/24 Trial Tr. 34:13-35:2; 41:21-42:20; 51:20-52:5.
[78] Doc. No. 89. 2/1/24 Trial Tr. 52:11-13.
[79] Doc. No. 89. 2/1/24 Trial Tr. 54:15-57:1.
[80] Doc. No. 89. 2/1/24 Trial Tr. 49:4-45:51:10.
[81] Doc. No. 88. 1/31/24 Trial Tr. 47:21-48:22.

being unlawfully intoxicated by alcohol or drugs.[82] "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Negative inferences drawn from an assertion of the Fifth Amendment, however, cannot be substituted for the evidence needed to meet the burden of production. *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991). Courts hold wide discretion in deciding whether to make adverse inferences in response to a party's invocation of the Fifth Amendment. *SEC v. Monterosso*, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010).

The Court finds good cause to draw adverse inferences from Defendant's invocation of the Fifth Amendment. Jacoub elected to file for bankruptcy. He wishes to receive the benefits provided by bankruptcy including discharging the debt owed to Murillo. There is no constitutional right to a discharge in bankruptcy. *United States v. Kras*, 409 U.S. 434, 446 (1973); *In re Wincek*, 202 B.R. 161, 169 (Bankr. M.D. Fla. 1996). It would, therefore, be manifestly unjust to allow Jacoub on one end to file for bankruptcy, wishing to discharge the debt owed to Murillo, and then to remain silent depriving Murillo of probative evidence from that night as she is seeking to prove that her debt is non-dischargeable. Jacoub was in the best position to testify as to his actions during the night leading up to the accident. Instead, he chose to remain silent, resulting in prejudice to Plaintiff by depriving her of the most probative source of evidence from that night. The Court therefore will draw adverse inferences from Jacoub's invocation of the Fifth Amendment.[83] As the questions focused on how much and when Jacoub was drinking alcohol or doing drugs, the Court will infer that alcohol or drugs were consumed in

---

[82] Surprisingly, Defendant has not advanced an argument as to why the Court should not make an adverse inference. Defendant merely notes that the Court has discretion to make an adverse inference and should the Court choose to draw an adverse inference, Plaintiff cannot meet her burden on that alone.

[83] The Court also notes that it has not been made aware of any pending criminal proceeding resulting from this accident that dates back to 2019.

sufficient amounts and close in time to the accident such that Jacoub was impaired by alcohol or drugs while driving the Nissan.

Plaintiff has met her burden showing that Jacoub was intoxicated by alcohol or drugs to the extent that his normal faculties were impaired. Jacoub admitted to drinking alcohol the night of the accident on multiple occasions including admitting to having some beers and some shots. He also admitted to doing cocaine two hours prior to the accident. Significantly, Paramedic Kiture, the witness who spent the most time with Jacoub in close proximity behind ambulance doors, believed that he was impaired by and under the influence of alcohol. Additionally, the medical resident observing Jacoub left a note indicating that he was grossly intoxicated, and Dr. Davidson testified that it was the ordinary practice of the hospital to leave that note only when a patient was obviously intoxicated and not in their normal state of mind. These accounts are further corroborated by the testimony of Officer Alden and the expert testimony of Dr. Kadiyala. This is further bolstered by the adverse inference this Court draws from Jacoub's refusal to testify or deny that he was impaired that evening. This evidence taken together allows the Court to conclude that it is more likely than not that Jacoub was intoxicated by alcohol or drugs at the time of the crash in violation of Florida law. Therefore, any debt to Murillo for personal injuries sustained as a result of the accident are not discharged.

*Jacoub was Driving the Nissan*

Lastly, Defendant advanced an argument that he was not the driver of the Nissan, which the Court finds to be completely meritless.[84] The Nissan that struck Murillo was a rental car from Enterprise. Jacoub admits to having rented and signed the rental agreement for the Nissan. A witness to the accident, Henry, saw only Jacoub in the Nissan after the crash. Dr. Kadiyala's

---

[84] Perhaps realizing the futility of this argument, Defendant appeared to not renew the argument during trial or in closing arguments. However, since Defendant advanced this argument in his summary judgment motion, which the Court denied, the Court will briefly discuss the merits of this argument.

analysis found that there was only a driver in the Nissan.[85] He based this finding on data that indicated that only the driver seatbelt was buckled.[86] Had there been a passenger in the Nissan with their seatbelt unbuckled, they would have flown through the windshield, which would leave spidering in the windshield.[87] The lack of spidering in the windshield of the Nissan, therefore, led Dr. Kadiyala to conclude there was only a driver present in the car.[88] Moreover, at numerous instances, Jacoub himself admitted to being the driver. Based on this overwhelming evidence, the Court finds Plaintiff has more than adequately met her burden showing that Jacoub was driving the Nissan that crashed into the Toyota.

### Section 523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." A malicious injury is one that is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Kane v. Stewart Tilghman Fox & Bianchi PA (In re Kane)*, 755 F.3d 1285, 1294 (11th Cir. 2014). The Supreme Court has noted for an injury to be willful, it must be "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to an injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Eleventh Circuit has interpreted an intentional act "which is substantially certain to cause injury" to fall within the ambit of a deliberate or intentional injury, however, has not said whether that should be analyzed through an objective or subjective standard.[89] *In re Kane*, 755 F.3d at 1293.

---

[85] Doc. No. 88. 1/31/24 Trial Tr. 73-1:9.
[86] Doc. No. 88. 1/31/24 Trial Tr. 73-1:9.
[87] Doc. No. 88. 1/31/24 Trial Tr. 73-1:9.
[88] Doc. No. 88. 1/31/24 Trial Tr. 73-1:9.
[89] Under the subjective standard, the creditor must prove that the debtor knew his act was substantially certain to cause injury while under the objective standard, the creditor need only prove that the act itself is substantially certain to cause injury. *In re Kane*, 755 F.3d at 1293.

Plaintiff has not met her burden showing that willful injury occurred by Jacoub. In reaching its decision in *Geiger*, the Supreme Court noted that it was interpreting § 523(a)(6) in a manner that would not render § 523(a)(9) superfluous. 523 U.S. at 62. Accordingly, to give meaning to § 523(a)(9), something more is required than unlawfully driving while intoxicated to show that a debtor's actions were willful under § 523(a)(6) whether utilizing a subjective or objective standard. Plaintiff argues that the something more is the manner in which Jacoub was driving and that the Court should draw an adverse inference again due to Jacoub asserting the Fifth Amendment. The Court is unpersuaded. Plaintiff is unable to point to any evidence other than indicating that Jacoub was driving recklessly. Reckless behavior, however, is the exact kind of conduct that the Supreme Court said does not constitute willful behavior. Since Plaintiff cannot point to any other evidence that indicates Jacoub's actions were willful, Plaintiff cannot meet her burden of proof as an adverse inference is not a substitute for the evidence needed to meet the burden of production.

### Conclusion

There is an old saying that if something looks like a duck, walks like a duck, and quacks like a duck, then it probably is a duck. Plaintiff has put forth sufficient evidence to persuade the Court it is more likely than not that the simplest explanation for what happened the early morning hours of June 16, 2019 on State Road 408 is the correct one – Jacoub was unlawfully intoxicated from using alcohol or drugs when he crashed into the Toyota, leaving Murillo paralyzed from the neck down. Murillo's claim is non-dischargeable under § 523(a)(9), and Jacoub's bankruptcy will not prevent Murillo from collecting for her personal injuries. The Court will enter a separate Final Judgment consistent with this Memorandum Opinion.